UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

NML CAPITAL, LTD,

        Plaintiff,                      Case No. 13-mc-51030

v                                               Honorable Thomas L. Ludington

REPUBLIC OF ARGENTINA,

        Defendant

v

DOW CHEMICAL,

        Movant.

_____/

**ORDER DIRECTING PARTIES TO FILE ADDITIONAL BRIEFS**

The Republic of Argentina and Dow Chemical Company have both moved to quash a subpoena served on Dow by NML Capital LTD. ECF No. 1, 15. NML Capital served the subpoena on Dow in an attempt to locate property to satisfy judgments rendered against the Republic by federal courts in New York. The subpoena attempts to obtain potentially relevant information about the Republic's attachable assets.

**I**

Between 1998 and 2002, the Republic of Argentina "experienced one of the worst economic crises in its history. Economic output fell by about 20 percent over 3 years, inflation reignited, the government defaulted on its debt, [and] the banking system was largely paralyzed." IMF, *Lessons from the Crisis in Argentina* 3 (Timothy Geithner ed. Oct. 2003). This dispute arises out of the second part of that crisis: the Republic's default on its bond obligations.

In December 2001, the Republic declared a moratorium on servicing $80 billion of the nation's external sovereign debt (i.e., money owed to foreign creditors). Over the next decade, the Republic sought to restructure its obligations through global debt exchange offers, which were largely successful.

In 2005 the Republic opened the first bond exchange with private creditors. Although the recovery rate was low (27%-30% of original value), the Republic successfully exchanged $62.3 billion in old bonds for $35.2 billion in new bonds. J.F. Hornbeck, *Argentina's Defaulted Sovereign Debt: Dealing with "Holdouts"*, CRS 7-5700, at 5 (2013).

The Republic next addressed the $9.5 billion debt owed to the International Monetary Fund. By repaying that debt in full in 2006, the Republic was relieved of any pressure to follow IMF policy constraints. IMF Managing Director Rodrigo de Rato welcomed the early repayment, stating that it "reflects [Argentina's authorities'] confidence that their external position is sufficiently strong to warrant early repayment." 35 *Brazil and Argentina Repay IMF Loans Early*, IMF Survey 9 (2006). The repayment was not without critics, however; in particular, some suggested that the IMF should have received the same treatment as other creditors. *See* Joseph E. Stiglitz, *Argentina is Recovering*, Project Syndicate (2002).

In 2010 the Republic initiated a new bond exchange with creditors. Some $12.4 billion of the $18.4 billion in bonds were exchanged, leaving only $6.0 billion untendered. After the second bond exchange, the Republic had successfully restructured over 91 percent of its non-performing debt on more favorable terms.

Plaintiff NML Capital, a hedge fund that had purchased some amount of the remaining 9 percent of the debt, chose not to participate in the Republic's debt restructuring. Instead, NML sought to enforce the bonds through litigation in the United States District Court in the Southern

District of New York. That court ultimately awarded five money judgments in NML's favor against the Republic totaling more than $1.6 billion (with interest).

The present dispute arises out of NML's attempt to execute on those judgments. More particularly, it arises out of NML's attempts to discover attachable assets by subpoenaing entities doing business in the Republic, like the Dow Chemical Company.

Since 1957, Dow Chemical has operated in the Republic through several wholly owned subsidiaries (collectively, "Dow Argentina") selling various products including plastics, chemicals, agricultural products, and hydrocarbons. Last year, Dow Argentina had sales of more than $2 billion.

In April 2013, NML served a subpoena on Dow seeking information about Dow's operations in the Republic. The subpoena broadly defines both Argentina and Dow, providing:

> The term "Argentina" means the Republic of Argentina, as well as its ministries, political subdivisions (including without limitation all provinces, cities, municipalities, and the like), representatives, and assigns, and all other persons acting or purporting to act for or on Argentina's behalf, whether or not authorized to do so. For the avoidance of any doubt, "Argentina" includes, but is not limited to, Yacimientos Petroliferos Fiscales S.A. ("YPF").[1]
>
> . . .
>
> The terms "The Dow Chemical Company," "you," and "your" mean The Dow Chemical Company, its parents, subsidiaries, and affiliates, including but not limited to locally incorporated entities in Argentina, as well as their officers, directors, principals, agents, representatives, and all other persons acting or purporting to act for or on its behalf, whether or not authorized to do so.

The subpoena goes on to enumerate six broad categories of documents sought from Dow. In full, they are:

---

[1] YPF is an Argentine oil and gas company; the Republic of Argentina is a 51 percent owner. In passing, it should be noted that in response to Dow's objections to the scope of the subpoena, it seems that NML has offered to narrow the definition of "Argentina" to mean "Argentina *only*, i.e., the Republic itself, including its political subdivisions but excluding purportedly independent instrumentalities" such as YPF. *See* NML's Resp. to Argentina's Mot. to Quash 5 (emphasis in original).

1. All documents relating to new or potential investments or any other form of participation or involvement in the production of hydrocarbons within Argentina. Such documents shall include but not be limited to, Agreements, memoranda of understanding, statements of intent, correspondence of all types, meeting agendas, and notes.

2. Documents that identify (a) any individual who has met or communicated with representatives of Argentina (including without limitation representatives of YPF on your behalf; and (b) the date(s), time(s), and subject matter(s) of all such meetings or communications.

3. All documents concerning any payments or potential payments by you to Argentina, including without limitation YPF, or negotiations in regard to such payments. Such payments include, but are not limited to, signing bonuses, royalties, production shares and taxes of any type.

4. All documents concerning any sales or deliveries, or potential future sales or deliveries of hydrocarbons by you to Argentina (including without limitation YPF) or by Argentina (including without limitation YPF) to you.

5. All documents relating to communications between representatives of Argentina (including without limitation, representatives of YPF and attorneys), and you (including without limitation, your attorneys, brokers, and other agents) concerning Argentina's control of YPF or Argentina's use of YPF assets.

6. All documents relating to communications between representatives of Argentina (including without limitation, representatives of YPF and attorneys), and you (including without limitation, your attorneys, brokers or other agents) concerning any efforts or means to avoid, or to seek to avoid, (a) the potential for attachment or seizure of property by creditors of Argentina, or (b) the disclosure of information potentially relevant to the identification of property of Argentina.

Both the Republic and Dow now seek to quash the subpoena.

## II

As a threshold matter, the Republic argues that it is immune from post-judgment discovery under the Foreign Sovereign Immunities Act, and therefore the Court must quash the subpoena served on Dow.

For more than 150 years, "the United States gave absolute immunity to foreign sovereigns from the execution of judgments. This rule required plaintiffs who successfully obtained a judgment against a foreign sovereign to rely on voluntary repayment by that State." *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 749 (7th Cir. 2007) (citations omitted).

This policy of "absolute immunity" changed in 1952. With the "Tate Letter," the Department of State "announced its adoption of the 'restrictive' theory of foreign sovereign immunity. Under this theory, immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487 (1983) (citation omitted).

The new restrictive theory "threw immunity determinations into some disarray, because political considerations sometimes led the Department to file suggestions of immunity in cases where immunity would not have been available under the restrictive theory." *Samantar v. Yousuf*, 130 S. Ct. 2278, 2285 (2010) (quotations omitted).

Responding to the disarray, Congress enacted the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§1330(a), 1602-1611. Its purpose was two-fold: "(1) to endorse and codify the restrictive theory of sovereign immunity, and (2) to transfer primary responsibility for deciding claims of foreign states to immunity from the State Department to the courts." *Samantar*, 130 S. Ct. at 2285 (quotations omitted); *see also* § 1602 (providing findings and statement of purpose).

Section 1605 of the FSIA provides for subject matter jurisdiction to adjudicate claims *in personam* against a foreign state if one of the listed exceptions, including waiver of immunity, exists. 28 U.S.C. § 1605.

Section 1609 codifies the general rule that a foreign state's property is immune from attachment in aid of execution, providing that "the property in the United States of a foreign state shall be immune from attachment[,] arrest and execution." 28 U.S.C. § 1609.

Section 1610 goes on to establish limited exceptions to this immunity. Pertinent to this case, § 1610 provides that "property in the United States of a foreign state" is not immune from attachment if it is "used for commercial activity in the United States" and

(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

(2) the property is or was used for the commercial activity upon which the claim is based, or

(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

(4) the execution relates to a judgment establishing rights in property —

(A) which is acquired by succession or gift, or

(B) which is immovable and situated in the United States: *Provided*, That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

(5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment, or

(6) the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement, or

(7) the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7) (as such section was in effect

> on January 27, 2008), regardless of whether the property is or was involved with the act upon which the claim is based.

§ 1610(a)(1)–(7).

The Republic asserts that this framework "aim[s] to protect foreign sovereigns from the burdens of litigation, including . . . discovery." The Republic further asserts that the FSIA applies to post-judgment discovery, thereby circumscribing the information available in discovery. In particular, the Republic argues that because Dow's assets in Argentina are categorically immune from attachment under the FSIA, the subpoena is not reasonably calculated to assist in collecting on a judgment.

The Sixth Circuit has not yet addressed the issue of whether FSIA immunity extends to discovery. The circuits that have done so have reached opposite conclusions. *See, e.g., EM Ltd.*, 695 F.3d 201, 209 (2d Cir. 2012) ("The Seventh Circuit came to a different conclusion in *Rubin*, holding that the FSIA requires a judgment creditor to identify specific non-immune assets before it is entitled to further discovery about those assets. We respectfully disagree.") (citing *Rubin v. The Islamic Republic of Iran*, 637 F.3d 783, 792-94 (7th Cir. 2011)).

In *Rubin v. The Islamic Republic of Iran*, the Seventh Circuit reversed an order for unlimited general asset discovery against Iran because it violated the FSIA's statutory scheme. 673 F.3d 783. The plaintiffs in *Rubin* were American citizens who were injured in a suicide bombing in Jerusalem, Israel, carried out by Hamas with the assistance of Iran support. *Id*. at 785. The plaintiffs obtained a $71 million default judgment against Iran and then served Iran with requests for discovery regarding all Iranian-owned assets in the United States. *Id*. After the district court granted the discovery request, Iran appealed the decision, claiming that it was immune from discovery under the FSIA. *Id*.

The Seventh Circuit stated that the immunity offered by the FSIA is a "default presumption" that "inheres in the property of the foreign state." In particular, when a plaintiff seeks to attach property of the foreign state, "immunity is presumed" under the FSIA. *Id*. at 800. Furthermore, the court held that third parties retaining a possessory interest in foreign state property also have standing to assert the sovereign's FSIA immunities. *Id*. at 801. The Seventh Circuit thus held that the FSIA grants sovereign states immunity from post-judgment discovery.

In contrast, the Second Circuit held that the FSIA does not limit post-judgment discovery. *EM Ltd.*, 695 F.3d at 209. In *EM Ltd.*, NML Capital, as judgment creditor, sought discovery about Argentinian assets in the United States. Specifically, NML Capital had served subpoenas duces tecum on two non-party banks regarding those assets. Argentina argued that the banks' compliance with the subpoenas would infringe on its sovereign immunity provided by the FSIA.

The Second Circuit acknowledged that it does not have the authority to provide for the attachment of Argentinian property in other countries under the FSIA. The FSIA does, however, allow a district court to order discovery to enforce its judgment if the court already has personal jurisdiction over the parties pursuant to section 1605. The court concluded: "Whether a particular sovereign is immune from attachment must be determined separately under the FSIA, but this determination does not affect discovery." *Id*. Furthermore, once a court has jurisdiction over a sovereign, the court can exercise its judicial power "over any other party." *Id*. In the situation where a subpoena is served on a third-party, the subpoena "does not implicate Argentina's immunity from attachment under the FSIA." *Id*. at 208.

The Republic has petitioned for a writ of certiorari regarding the Second Circuit's decision in *EM Ltd.* 2013 WL 122883 (U.S. Jan. 7, 2013) (No. 12-842). Specifically, the petition presents the question of "[w]hether post-judgment discovery in aid of enforcing a

judgment against a foreign state can be ordered with respect to all assets of a foreign state regardless of their location or use . . . ."  The petition is currently pending before the Supreme Court, and the Solicitor General has been invited to file a brief in the case. *Republic of Argentina v. NML Capital, Ltd.*, 133 S. Ct. 1855 (2013).

### III

The petition pending before the Supreme Court directly addresses a threshold issue that may govern this Court's decision on whether to quash the subpoena served on Dow.

Accordingly, the parties are **DIRECTED** to file supplemental briefs addressing the propriety of staying, as opposed to deciding, the current motion to quash pending the Supreme Court's decision on *Republic of Argentina v. NML Capital, Ltd.*'s petition for certiorari on or before **Friday, October 11, 2013**.  Responses are due on or before **Monday, October 21, 2013**.

It is so **ORDERED**.


                                                    s/Thomas L. Ludington
                                                   THOMAS L. LUDINGTON
                                                   United States District Judge

Dated: September 18, 2013

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 18, 2013.

                            s/Tracy A. Jacobs
                            TRACY A. JACOBS